UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KELLIE PEACOCK,                         :
                                        :    HONORABLE JOSEPH E. IRENAS
               Plaintiff,               :
                                        :       CIVIL ACTION NO.
        v.                              :       07-5920 (JEI/AMD)
                                        :
ALBERTSONS ACME MARKETS and             :       **OPINION**
DEBBIE CARLUCCI,                        :
                                        :
               Defendants.              :

**APPEARANCES:**

RICHARD M. PESCATORE, P.A.
By: Richard M. Pescatore, Esq.
1055 East Landis Ave.
Vineland, New Jersey 08360
        Counsel for Plaintiff

BUCHANAN INGERSOLL & ROONEY PC
By: Elizabeth A. Malloy, Esq.
1835 Market Street, 14th Floor
Philadelphia, Pennsylvania 19103
        Counsel for Defendants

**IRENAS,** Senior District Judge:

        Plaintiff, Kellie Peacock, brings this New Jersey Law

Against Discrimination, N.J.S.A. 10:5-1 et. seq. ("NJ LAD"),

action against her former employer, Defendant Albertsons Acme

Markets ("Acme") and Defendant Debbie Carlucci, the manager of

the Acme store where Peacock worked.  Peacock asserts that she

was constructively discharged in violation of NJ LAD as a result

of a work environment that was hostile to her alleged disability,

and Acme's alleged failure to accommodate her disability.

Defendants presently move for summary judgment.  For the reasons

stated herein, the motion will be granted.[1]

## I.

Peacock's claims arise out of her employment as a deli clerk at the Acme supermarket in Pennsville, New Jersey from January, 2004 until December, 2006.  On August 31, 2005 Peacock asserts that she injured her shoulder at work after lifting a 40-50 pound box of chicken.  Peacock alleges that when she presented Carlucci with a doctor's note, recommending that she not attend work until receiving an MRI, Carlucci referred to her workers' compensation claim as "bullshit" because she didn't "do" the injury at Acme. (Peacock Dep. 26:22-27:12).  Carlucci contends there is no evidence that she used such language when speaking to Peacock in September 2005, but that she did question the veracity of Peacock's injury and her performance.  *See* Stmnt. of Undisp. Facts ¶ 11.  On January 4, 2006, Peacock underwent shoulder surgery and received workers compensation benefits until she returned on February 27, 2006, with restrictions not to lift more than ten pounds with her left arm. (Peacock Dep. 31:13-15; 32:3-33:19-24).

On March 29, 2006, Peacock dropped a tray of rotisserie

---

[1]  Subject matter jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.  Peacock is a citizen of New Jersey.  Carlucci is a citizen of Pennsylvania.  Acme is a citizen of Delaware and Pennsylvania.  The amount in controversy is alleged to exceed $75,000.

chicken and was allegedly called into Carlucci's office and told "maybe this job isn't good for you . . . maybe you're not going to be able to work here." (Peacock Dep. 79:16-22).  Peacock told Carlucci that she should not have been lifting the rack of chicken with her shoulder injury, even though Peacock acknowledges that she had no medical restrictions at the time. (Peacock Dep. 43:16-22).  Carlucci advised her to visit a doctor to obtain new restrictions.[2]  (Id. at 43:3-10; 78:6-80:31; 79:3-13).  Peacock claims that she felt intimidated by her supervisor's comments during that conversation.  Carlucci contends that Peacock was not forced to work outside of her restrictions when she dropped the tray of chicken, but was simply scolded for not doing her job.  *See* Stmnt. of Undisp. Facts ¶ 18.

At work on April 21, 2006, Peacock felt a burn in her shoulder while loading the meat wall, and made an appointment to see her doctor on April 27, 2006.  (Peacock Dep. 50:3-16).  Peacock's doctor classified her shoulder aggravation as a second injury, which took her away from the job for a week pending a follow-up appointment.  (Peacock Dep. 46:3-9; 50:12-16).  Peacock alleges that when she called Carlucci to report her second

---

[2]  In response to Carlucci's request, Peacock visited the doctor and obtained new restrictions on April 10, 2006, prohibiting her from lifting objects overhead.  (Peacock Dep. 43:11-155).  She continued to work in the deli department, performing tasks within her restrictions.  (Id. at 36:8-16)("no lifting food out of fryer, no putting chicken on rotisserie.").

3

injury, Carlucci yelled and cursed at her, characterizing her claim as "bullshit" and accusing her of being a "fucking liar." (Peacock Dep. 46:24; 49:2-4).  Carlucci testified that she said, "Kellie, this is bullshit, you know the rules," because Peacock was aware of the policy of reporting work injuries within 24 hours, yet disclosed her injury six days after being injured. (Carlucci Dep. 35:22-36:2; 54:22-55:7).

Peacock returned to work around July 20 and worked through August 2006 with her arm in a sling.  Peacock had no problems with Carlucci during this time.  (Peacock Dep. 58:12-14; 54:14-55:14).  On September 1, 2006, Peacock left work for a second shoulder surgery and received workers' compensation benefits during her time away from Acme.  (Id. at 59:10-60:4).

Although Peacock received medical clearance to return to work with her arm in a sling on November 9, 2006, she remained at home on workers' compensation.  Peacock believed that Acme either did not want her to return to work with a sling or did not have a one arm job for her.  (Id. at 84:7-85:6).  Carlucci testified that she did not receive notice of Peacock's intended return date, including the doctor's note indicating Peacock's "arm in sling" restriction.  (Carlucci Dep. 38:11-17; 40:7-24).

When Peacock returned to work with her arm in a sling on December 18, 2006, the parties disagreed about its necessity and Peacock's level of restriction at work.  (Peacock Dep. 66:17-

4

67:2).  Peacock claims that after having two shoulder surgeries,
wearing a sling was necessary for her protection, however,
Carlucci cites that no such restriction was noted by her
physician.  (Peacock Dep. 81:21-83:23: Exh. 5 to Dep.: Doctor's
note, Dec. 14, 2006).

On December 20, 2006, Peacock again came to work wearing the
sling and alleges that she was called to Carlucci's office and
accused of "playing the system."  (Pl.'s Resp. to Defs.' Stmnt.
of Undisp. Facts ¶ 41).  Peacock felt that she was going to be
fired during her conversation with Carlucci, but was never
explicitly threatened with termination.  (Peacock Dep. 69:20-21;
71:1-6).  After leaving Carlucci's office, Peacock clocked out,
left the store, and did not return.  (Id. at 68:7-10;74:16-18).

Peacock asserts that Carlucci's repeated accusations of
lying about her injury and not doing her assigned jobs were the
reasons she left work.  Peacock spoke with a union representative
twice: once, while employed at Acme, to complain about Carlucci
"cussing at her;" and a second time on the day she left Acme.
(Id. at 86:24-88:19).  This union representative never returned
Peacock's phone call. (Id. at 90:5-6).

Peacock's complaint alleges that Acme violated the NJ LAD by
discriminating against her on the basis of her disability (by
constructively discharging her) and that Carlucci aided and
abetted Acme's NJ LAD violation.  Peacock pursues two distinct

5

theories of liability: (1) that Carlucci allegedly created a hostile work environment which forced Peacock to quit; and (2) that Acme's alleged failure to accommodate Peacock's disability forced her to quit.

Defendants move for summary judgment on all claims.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

Defendants move for summary judgment on both claims, only asserting that no reasonable factfinder could find that Peacock suffered an adverse employment action-- namely, that a reasonable factfinder could only conclude the alleged hostile work environment was not sufficiently severe or pervasive to justify Peacock's resignation; and that Peacock's alleged disability was accommodated.[3]  The Court addresses each argument in turn.

### A.   Hostile Work Environment

In a NJ LAD-based hostile environment claim, a plaintiff must demonstrate that: (1) the conduct complained of was unwelcome; (2) that it occurred because of plaintiff's inclusion in a protected class under the NJ LAD; and (3) that a reasonable

---

[3]  To survive summary judgment on a failure to accommodate claim, Peacock must show that she: (1) had a NJ LAD handicap; (2) was qualified to perform the essential functions of the job, with or without accommodation; and (3) suffered an adverse employment action because of a failure to accommodate her handicap. *Bosshard v. Hackensack Univ. Med. Ctr.,* 345 N.J. Super 78, 90 (App. Div. 2001); *Seiden v. Marina Assocs.*, 315 N.J. Super. 451, 459 (Law Div. 1998)).  As Defendants make no argument as to the first two prongs, the Court assumes for purposes of this motion only, that Peacock had a NJ LAD handicap and was qualified to perform the essential functions of the deli clerk position.

person in the same protected class would consider it sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive work environment. *El-Sioufi v. St. Peter's Univ. Hosp.*, 382 N.J. Super. 145, 178 (App. Div. 2005) (citing *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603 (1993)).

Peacock relies on four conversations with Carlucci that took place over the course of her almost three year employment with Acme to support her hostile work environment claim.  The first conversation took place on September 1, 2005 when Peacock reported her shoulder injury to Carlucci and then went to the doctor.  (Peacock Dep. 25:1-26:11).  Peacock testified that when she gave Carlucci the doctor's note, Carlucci told her it was "bullshit, that she was going to fight [Peacock] on it, [and] that [she] didn't do that there."  (Peacock Dep. 26:19-27:1; Carlucci Dep. 19:8-12).

Peacock claims that the second incident took place on March 29, 2006, when Carlucci said, "[m]aybe this job isn't good for you...maybe you're not going to be able to work here," after Peacock dropped a tray of chicken.  (Peacock Dep. 79:16-22).  At the time, Peacock was not under any medical restrictions while working at Acme.  Carlucci screamed, swore, and called Peacock a liar while urging her to obtain new medical restrictions. (Peacock Dep. 38:21-40:13).

In the third instance, Carlucci believed that Peacock had violated company policy when she did not report the aggravation of her injury six days after it occurred.[4]  Carlucci said "Kellie this is bullshit, you know the rules." (Carlucci Dep. 35:22-36:2; 54:22-55:7).

Finally, six months later, Carlucci questioned the use and appropriateness of Peacock's arm sling, saying "what's the matter, are you afraid [to use your arm]," when the undisputed record evidence shows that Peacock had no medical documentation of her need for a sling.  (Carlucci Dep. 38:11-17; 40:7-24);Peacock Dep. 81:21-83:23: Exh. 5 to Dep.: Doctor's note, Dec. 14, 2006).

Considering the facts in the light most favorable to Peacock, Carlucci may have engaged in conduct that created an unpleasant work environment by repeatedly using coarse language and questioning the legitimacy of Peacock's injuries.[5]  However,

---

[4]  Peacock explained that she did not report the injury to Acme, because she did not think it was a "new injury."  Peacock assumed it was the same shoulder problem from the earlier injury, which did not require reporting.  (Peacock Dep. 47:14-50:16).

[5]  Carlucci was skeptical of Peacock's claims and in order to determine whether Peacock was "faking it," asked Acme's insurance company to conduct surveillance on her.  (Carlucci Dep. 31:2-5; 44:3-12).  Carlucci's concerns in this regard apparently stem from the undisputed fact that her bonus is inversely related to the number of workers compensation claims filed by store employees. (Carlucci Dep. 45:17-46:22).  Plaintiff's counsel emphasizes this fact, arguing that it is evidence of discrimination, or at least motive to discriminate.  The Court disagrees.  Carlucci's incentive to keep workers' compensation

Carlucci's conduct did not rise to a level that was sufficiently "severe or pervasive" to compel a reasonable employee in Peacock's position to terminate her employment based on a hostile working environment. *See Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 592 (1993).

In the context of constructive discharge, an employee "has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit." *Woods-Pirozzi v. Nabisco Foods*, 290 N.J. Super 252 (App. Div. 1996).[6] No reasonable juror could conclude on this record that Peacock thoroughly explored alternatives to resignation before she actually resigned. While she did write a letter to Acme Human Resources reporting Carlucci's alleged discriminatory conduct, she only did so on December 22, 2006-- after she resigned.[7]

---

claims down is conceptually distinct from a motive to discriminate, and in any event does not support an inference of actual discrimination.

[6] *See also Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d. Cir. 1993)(noting "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option.")(ADEA case).

[7] The record also suggests that Peacock contacted a union representative and complained to a co-worker about Carlucci's actions. With regard to the co-worker complaint, a reasonable juror could not find Peacock's action to be a thorough exploration of her alternatives to resignation because the co-worker had no power to remedy the situation. With regard to the union complaint, a reasonable juror could not find that an unanswered telephone call was sufficient effort to salvage Peacock's job.

Peacock relies on *Taylor v. Metzger*, 152 N.J. 490 (1998) and *Thomas v. Town of Hammonton*, 351 F.3d 108 (3d Cir. 2003) to assert that Carlucci's actions are sufficient to sustain a hostile work environment claim, but those cases are readily distinguishable.  In *Taylor*, the plaintiff presented sufficient evidence that her supervisor's use of a racial epithet was unambiguously demeaning and sufficiently severe enough to create a hostile work environment.[8]  *Taylor*, 152 N.J. at 502.  In *Thomas*, use of the term "bitch" used in conjunction with other disparaging remarks and descriptions of sexual activity subjected the plaintiff to severe harassment because of her gender.  *Thomas*, 351 F.3d at 117.

In this matter, Peacock does not allege that Carlucci used a racial epithet, gender demeaning term, or anything analogously demeaning to someone with a disability.  Questioning whether Peacock actually had a disability or the extent of the disability is not as outrageous or patently offensive by societal standards as the examples in *Taylor* and *Thomas*.  Even if a reasonable juror could interpret Carlucci's comments as accusing Peacock of exaggerating or faking her injury, such accusations, when taken in the context of this case, do not rise to a level that a

---

[8]  The Court determined that use of the term "jungle bunny" was a racist slur, the severity of which was exacerbated by the fact that it was uttered by a superior officer.  *Taylor*, 152 N.J. at 503.

reasonable employee would find intolerable.  Accordingly, Defendants are entitled to summary judgment on the hostile work environment claim.

**B.    Failure to Accommodate**

Defendants further argue that Acme is entitled to summary judgment on Peacock's failure to accommodate claim, asserting that Peacock cannot point to a single incident where Acme failed to provide a reasonable accommodation.  In order to prevail on a failure to accommodate claim under the NJ LAD, a plaintiff must demonstrate that:  (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist; and (4) the employee could have been reasonably accommodated.  *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006); *Tynan v. Vicinage 13 of Superior Court*, 351 N.J. Super. 385, 396 (App. Div. 2002); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317-20 (3d Cir. 1999).

Peacock contends that Carlucci's repetitive accusations of fraud and threat to fight her workers' compensation claim constitute a failure to accommodate.  (Peacock Dep. 26:20-24). Following her initial injury, Peacock claims that upon her return to Acme, Carlucci was skeptical of her injury and sent her to the doctor three times to obtain specific restrictions on her work

12

activity.[9]  (Peacock Dep. 29:20-30:14).

This evidence is insufficient as a matter of law.  The record contains no evidence from which a reasonable factfinder could find (or infer) that Acme refused any accommodation or required Peacock to perform tasks she was restricted from performing.  Indeed, Peacock's counsel conceded this very point at oral argument.  Thus, Peacock has failed to present evidence supporting the third prong of her prima facie case.  *See Armstrong*, 438 F.3d at 246.[10]

Peacock herself testified that when she was under medical

---

[9]  Carlucci called Peacock a "liar" and sent her to the doctor to obtain specific written limitations.  (Peacock Dep. 30:6-7).  For example, Peacock obtained a note restricting her from lifting chicken from the rotisserie or pulling chicken from the fryer.  (Id. at 30:9-14).

[10]  It is also questionable whether Peacock requested accommodations before she resigned.  While there are no magic words to seek an accommodation, the employee "must make clear that . . . assistance [is desired] for his or her disability." *Jones v. United Parcel Service*, 214 F.3d 402, 408 (3d Cir. 2000)(quoting *Taylor*, 184 F.3d at 313).  An employee may use plain English and need not mention any legal source requiring accommodation.  *Taylor*, 184 F.3d at 313.  Although Peacock testified that she submitted doctors notes identifying her work restrictions, the Court questions whether the mere submission of doctors' notes constitutes a clear indication that the employee needs her employer to make certain accommodations.  However, because Peacock's prima facie case fails for independent reasons, the Court need not make a ruling on this issue.
Similarly, Peacock suggested at her deposition that she could have been temporarily transferred out of the deli department while her shoulder healed (Peacock Dep. at 75:13-20), however, there is no evidence that she ever asked to be transferred.

restrictions, she was not required to perform tasks outside of her restrictions, such as slicing deli meat, but instead washed dishes, completed price checking, and assisted customers. (Peacock Dep. at 32:4-8; 44:18-45).  More specifically, Peacock testified that she was not allowed to lift more than ten pounds with her left arm and could not lift her arm overhead (Id. at 31:19-24; 33:19-22; 35-36:24-2), but there is no evidence of a time where Acme required her to lift more than ten pounds or lift something overhead with her left arm.  For example, while Peacock stated that one of the duties of deli clerk is to lift the rotisserie chickens into the oven (Id. at 30:10-14; 76:10-24), she testified that she was able to perform that duty with just her right arm, which she admitted was in accordance with her medical restrictions.  (Id. at 76:10-24)

Likewise, during the time Peacock's arm was in a sling, she testified that she did "one arm jobs" such as marking cheeses, maintaining the hot food counter, serving customers, and washing dishes, (Peacock Dep. at 54:1-23; 64:6-11), and there is no evidence that Acme required her to perform two arm duties during this time.

Without evidence that Acme failed to accommodate Peacock's medical restrictions, the failure to accommodate claim obviously

fails.[11]  Accordingly, summary judgment will be granted to Acme
on this claim.


**C.    Constructive Discharge**

As explained *supra*, Peacock has failed to adduce sufficient
evidence establishing her hostile work environment and her
failure to accommodate claims, therefore her constructive
discharge claim, which is dependent on the two prior claims, also
fails.  Summary judgment will be granted to Acme.


**D.    Aiding and Abetting**

In order to impose individual liability on a supervisor for
aiding or abetting, Peacock must establish a violation of the NJ
LAD by her employer under N.J.S.A. 10:5-12(d).  Because the
underlying hostile work environment and failure to accommodate
claims against Acme fail, the aiding and abetting claim against
Carlucci must also fail.  *See Jackson v. Del. River & Bay Auth.*,
No. 99-3185, 2001 WL 1689880, at *22 (D.N.J. Nov. 26, 2001).
Summary judgment will be granted to Carlucci on this claim.


**IV.**

For the foregoing reasons, the Court will grant Defendants'

---

[11]    As noted before, Peacock's counsel acknowledged that
while he pled a failure to accommodate claim, the principal harm
attacked in this suit is the alleged hostile work environment.

Motion for Summary Judgment.  An appropriate order will be
issued.


Dated: April 16, 2009



                                    s/ Joseph E. Irenas
                                   **Joseph E. Irenas, S.U.S.D.J.**